EXHIBIT "P"

| | |
|---|---|
| **From:** | Larry Wolinsky [lw@Jacobowitz.Com] |
| **Sent:** | Tuesday, May 29, 2012 4:57 PM |
| **To:** | Ian L. Schlanger; Frank Nussbaum; Ann Cutignola; Kristen O'Donnell; Alyse Terhune |
| **Subject:** | Outline Article 78 |
| **Attachments:** | 1D28412-Article 78 Outline.DOC |

Please review and insert your comments. Please try and get it back to me by Thursday. Focus on organization and elements of argument rather than language.

Thank you.

Larry

ARTICLE 78 SEQR LITIGATION OUTLINE

BT HOLDINGS, LLC and THE VILLAGE OF CHESTER
v.
THE TOWN of CHESTER

PRIVILEGED AND CONFIDENTIAL

1. Notice of Petition and Petition seeking to reverse and annul the Town of Chester's SEQRA Findings Statement and annexation order dated May 15, 2012 which determined that (a) the requirements of 6 NYCRR Part 617 have not been met and that the proposed action of annexation is one that does not avoid or minimize adverse environmental impacts to the maximum extent practical and that adverse impacts will not be avoided or minimized to the maximum extent practicable and (b) the annexation should be denied. (Note: I am of the opinion that the Town's failure to comply with SEQRA should stand as a distinct and independent ground for overturning its annexation order notwithstanding the issue of public interest)

2. The Town failed to follow the requirements of 6 NYCRR Part 617 by (a) by shirking its responsibility as a SEQRA Involved Agency and (b) by issuing Findings that have no support in fact or law and that are clearly contrary to the substantial evidence in the Record of the SEQRA proceedings. As the Town violated SEQRA its underlying action to deny annexation must be reversed.

3. Background: (FRANK N to assist where indicated)

Property at Issue:

Describe owner of property; its size and location; emphasize it borders Village. Assert its current zoning and status in Town Master Plan. How long BT has owned property (FN); its location in Town sewer district.

Describe BT holding initial development efforts and its discussions with munis. (FN)

Describe what led to decision to annex and reasons for annexation. (FN)

Initial annexation process:

Describe annexation: when petition was filed with Village and Town; land proposed to be annexed; and development concept for land to be annexed.

Identify initial joint hearing on Annexation (What did Town opine if anything at this hearing review transcript)

Annexation hearing to be held open pending completion of hearing.

SEQRA REVIEW:

2/11/2008 Village indicated its intent to be lead agency

4/14/2008 Village assumed its position of lead agency – (Ian - was there any letter from the Town consenting to the Village being Lead Agency?)

4/14/2008- Village issued pos. dec.

4/14/2008 acknowledged receipt of a draft scoping document submitted by petitioner.

4/30/2008 Village conducted a public scoping session on draft scope and  provided a public comment period until 5/22/2008 (need evidence of Town participation or lack of participation in scoping process).

Village Board finalized scope and adopted scope in final form on July 14, 2008.

DEIS draft submitted in May 2009; revised and resubmitted in October , 2009

DEIS determined as complete on November 9, 2009.

DEIS public hearing on January 7, 2010 – Need to determine level of Town participation and review what issues were raised.

Public comment period on DEIS concluded on _____ 2010

Years worth of technical review meetings to address agency and public concerns. Result, was series of project revisions. (Can we document (a) the Town being invited to participate in these and (b) its refusal to engage)

Detail the project revisions.

FEIS, setting fort the project revisions and responses to agency and public comment submitted on January 20, 2011.

FEIS revised and resubmitted April 22, 2011

FEIS further revised and accepted as complete on August 18, 2011. (Ian- need copy of resolution )

FEIS Document made available for public consideration and comment through 9/21/2011 and review on line at Village Clerk office and at Library. No response or comment from Town (correct????)

SEQR Findings prepared and adopted unanimously by VB on November 4, 2011. Findings then circulated  -including to Town.

Close Out of Annexation

Hearing by Village Board December ____ 2011. No participation by Town.

Joint hearing by Village Board and Town Board on December 14, 2011. Hearing Closed.

Efforts to reach out to the Town re issues and advised by Town on 3/18/2012 that Bd members would contact petitioner in the event of any issue

3/27/12  - supervisor sends Frank e-mail that Board is anxious to make decision and he puts on agenda "for discussion"

3/28/12 – Only discussion that occurs is why project should be denied. All conclusory rationales and no compliance with SEQR. LW warns that action is invalid before SEQR compliance and asks Board to rescind. Board says no.

Upon info and belief action taken to influence Village annexation vote which was scheduled for 4/2/2012

Upon info and belief , supervisor contacted various Village Board members in an attempt to influence their vote against annexation.

Village Board took its annexation vote on 4/2/201 and voted 3-2 in favor to grant annexation.

On or about, ____ the Town rescinded its illegal annexation vote.

On or about May 9, the Town voted to issue its own SEQR Findings and an order denying annexation.

4. Claims for Relief:

a) The Town violated SEQRA by failing to engage in the environmental review process in the manner required by the SEQRA regulations.

i) Law: "Each agency involved in a proposed action has the responsibility to provide the lead agency with it information it may have that may assist the lead agency in making its determination of significance, to identify potentially significant adverse impacts in the

scoping process, to comment in a timely manner on the EIS if it has concerns which need to be addressed and to participate as may be needed." 617.3 (e)

Re scoping: "Involved agencies should provide written comments reflecting their concerns, jurisdictions and information needs sufficient to ensure that the EIS will be adequate to support their SEQR Findings 617.8 (d) ." What did the Town do during scoping?????? "All relevant issues should be raised before he issuance of a final scope" 617.8 (g)

Town participation at DEIS hearing – generalized concerns at best and based on review of the wrong document.

No comment on FEIS at all despite the availability of a comment period to do so (Correct)

Town never hired its own experts to review and comment as would be typical.

Town refused to engage actively with Village or Petitioner despite requests to do so (Can we document this guys??????)

(I need everything everybody has to show reach out to Town and no response back……. And no Town participation…..)

b) The Town's SEQRA Findings have no support in fact or law and are clearly contrary to the substantial evidence in the Record of the SEQRA proceedings.

Law: The Town is an involved agency. "No involved agency may make a final decision to …disapprove an action that has been the subject of a final EIS until… the agency has made a written Findings Statement. 617.11 (c) "Findings must (1) consider the relevant environmental impacts, facts and conclusions disclosed in the final EIS." Insert standard hard look law.

The Town's Findings fail to consider the relevant environmental impacts, facts and conclusions disclosed in the FEIS. The Town's Findings totally ignore the relevant impacts, facts and findings disclosed in the FEIS. The Town's Findings are inconsistent and directly contrary to substantial evidence relating to the impacts, facts and conclusions disclosed in the FEIS. The Town as an involved agency cannot simply ignore the environmental record established by the lead agency and come to its own contrary conclusions simply because it wants to. As detailed in the cause of action above the Town had the responsibility and opportunity as an involved agency during the SEQRA process to set forth facts and data to support its conclusions and it did not. And, even in its illegal Findings Statement it had the opportunity to set forth the supporting basis of its conclusions cannot be mitigated It did not even do that. Rather, and as demonstrated below, it has set forth wholly inaccurate and conclusory findings which have no support in this or any environmental record….

i) Wastewater

As part of SEQR process Village required preparation of a wastewater study. The waste water study was reviewed and vetted by the Village Engineer as well as its Planning Consultant. The study, which is an objective engineering assessment of sewer options for the property and property development, demonstrated that at the time the study was undertaken, the proposed development, as revised would require 113,960 gallons per day of wastewater treatment capacity. The study further determined that Town's capacity was 148,000 gallons per day. The 148,000 gallon per day number took into account and deducted sewer capacity for pending projects (cite list). Thus, the 148,000 gallons per day was a net number <u>after</u> consideration of pending and approved projects.

The Town did not conduct its own independent wastewater analysis to rebut the study conducted by the Lead Agency. The Town did not have the study vetted by its own experts. The Town failed to participate in any meaningful manor with respect to this issue during the SEQRA process. If the Town disagreed with the Villagfe's analysis, it could have easily informed the Village of that disagreement and the basis for it. It did not.

The Town's Findings with respect to wastewater are inaccurate on various grounds:

The Town cites, in contrast to the study, that it has only 109,000 gallons per day available sewer capacity. The study indicates an available capacity of 148,000 gallons per day. While the study meticulously establishes its capacity number the Town fails to demonstrate any basis for its number. It just appears in its Findings for the first time after a ___ year SEQRA review.

The Town further inaccurately recites that "allowing the annexation of the subject parcel into the Village would further intensify the Village's pursuit of necessary sewer allocation." The finding is incorrect as a matter of law. Annexation into the Village places no obligation on the Village with regard to wastewater. It is the  Town district which has the legal obligation to provide sewer capacity. (cite) It is the Town Districts responsibility to provide sewer to the property if available or, if not available, within a reasonable period of time.

Relatedly, the Town also asserts that it "disputes" EIS disclosures that should the need to obtain additional capacity materialize that such capacity might be obtained through the districts purchase from the Orange County Sewer Treatment plant and or supply of capacity from a potential Black meadow wastewater treatment plant. Neither of these options is unrealistic and it was patently reasonable and arguably required for the EIS to disclose them. Purchase of additional capacity is a frequently discussed and exercised (??)  option for increasing the capacity in the basin (is there some example of this we can point too???). Further a planned Black Meadow wastewater treatment plan has been on the books for many years as a regional option for the increase of sewer capacity. (Ian what concrete examples can we give to legitimize this. Is there any resolutions or planning activities w=that were jointly taken by the Village and Town???) The Town's

raising of these totally speculative or non feasible is totally disingenuous and highlights the desperate nature of their argument.

Further, the Town totally ignores in its Findings that the Village imposed a condition that the property cannot be developed beyond available wastewater capacity. That condition provides the ultimate mitigation or protection against adverse impact to wastewater resources. Had the Town recognized and acknowledged in its Findings the existence of this condition it could not have come to any conclusion of unmitigated adverse impact. The condition is entirely protective of the Town and its District although as required by law, the District does have an obligation to create any needed capacity within a reasonable period.

Further, the claim by the Town that somehow the districts sewer obligation is limited to the existing tax assessment of 606 sewer units which the Town claims to be the equivalent of 60 single family units is sheer nonsense. The current assessment is based on the property in its vacant state as opposed to developed state. There is no legal authority that such assessment limits the Town's sewer obligation and the Town will not be able to provide any. The Town's own zoning allows a development similar in size to the one that is proposed. (see below). The argument is a red-herring and should be dismissed outright (We still need to review the Town sewer code)

Finally, the Town's claim that the Village's SEQRA review with respect to wastewater is wrong because it failed to consider other vacant parcels of land within the sewer district is also fallacious. (note inconsistent statements on this issue between Order and SEQRA Findings. First, the Town, in its capacity as an involved agency, never requested that a vacant land analysis be undertaken. It had the opportunity to do so at the time of scoping and did not and at the time of hearings and did not. Second, the study did expressly consider pending and approved projects within the district and deducted the needs of those projects in developing a capacity number. Third, notwithstanding the capacity available or not available, the district has a legal obligation to provide it.

ANYTHING ELSE ???????

ii) Water

At no time during the entire review process did the Town ever say that it would or is even in a position to provide municipal water for the subject property notwithstanding the fact that under its own master plan this is the one property in the Town that was designated for higher density development.

Indeed, Town admits in its Findings that "the need to secure water has continued to serve as the primary motivation ...to seek annexation".

However, the Town claims (a) that a site plan should have first been submitted to the Town Planning Board (b) water could have been provided by the Village to a Town Water District including the property by Outside User Agreement (c) that the availability

of on-site water to serve the property's development was not adequately investigated and (d) alternatives utilizing an outside user agreement and less water consumptive development proposals should have been pursued. The claims are all specious.

There is no requirement in the Annexation Law that a petitioner requesting annexation must first submit a site plan for property development to the Planning Board of the municipality in which the land presently resides. It is unclear why the Town even raises the issue because the Town fails utterly to explain the relevance of it in the context of its own Findings.

An outside user agreement was never available and is still not available. As indicated in the Affidavit of Frank Nussbaum, the potential for an outside user agreement was raised very early on and rejected as an option by the Village. This fact is conformed in the Affidavit of the Village Mayor who confirms that outside user agreements with the Town are rare and have only been for extremely limited and exigent purposes and would never be entertained in connection with a development of this nature where the impacts of development would primarily be felt by the Village and where the Village wants jurisdiction so it can control those impacts and also have the benefit of tax revenue to help offset those impacts. (Affidavits)

Contrary to the Town's assertion, the analysis of on-site water resources was completely reasonable. As indicated in the affidavits of Bryan Wasinor and Sergio Smiriglio, there were two on site water analyses conducted. The first was a Fracture Trace Analysis designed to determine the existence of water bearing fractures on the property and the likelihood that those fractures had the potential to produce adequate water supply for the envisioned development. The fracture trace analysis indicated that there was not a viable potential for adequate on-site water. This analysis was confirmed by a desk top analysis undertaken by Langan Engineer. That analysis (explain what it did). That analysis further concluded that there was not a viable potential for adequate on-site water. As testified to in the affidavits of >>>>>> The analyses that were conducted were based upon accepted professional practices and if they find there is no reasonable potential for an adequate water source the matter can be concluded and no additional testing, as what is advocated by the Town is necessary or required. It would simply be unreasonable to spend tens of thousands of dollars in water supply development in circumstances where the initial studies determine no potential for the water required. During the SEQR process the Town never submitted its own expert testimony on the water issue or produced any evidence that the way the on site water issue was determined was inappropriate or unreasonable.

Finally, the Town's Findings say that the SEQRA analysis should have considered an Outside User agreement as an alternative or the alternative of a less consumptive water use. Initially, if the Town wanted these considered a s alternatives it could have advocated for that at the time of Scoping. It did not and it cant be heard now to complain that these alternatives were not considered. (WAS THE SINGLE FAMILY DEVLOPMENT ALTERNATIVE LESS CONSUMPTIVE) In any event, not every conceivable alternative need be submitted. In addition, only a range of reasonable alternatives need be required. Town has not demonstrated that the alternatives considered

were unreasonable. In any event, a less consumptive water alternative was considered. However, because of other adverse impacts associated with that alternative and because the Village has an immediate an available source of water and because (insert reasons from Village Findings) and because the less consumptive alternative did not meet the development objectives of the project sponsor, it was rejected.

iii)  Fiscal Impacts:

The EIS contained a full fiscal impact analysis which considered the fiscal consequences of annexation and property development. Fiscal impacts look at both financial impacts to school districts and services provided by the Town. Typically, it is determined that there is no adverse impact where the identified financial impacts a re "break –even" or net positive (i.e. tax revenues exceed costs) The fiscal impacts of the proposed action were a net positive. The fiscal impact analysis was reviewed and vetted by the Village's Planning Consultants and the conclusions confirmed. At no time during the actual SEQRA review of the project did the Town challenge the methodology employed in the fiscal impact analysis or challenge conclusions reached by the Village based on its own independent review and assessment of the actions' fiscal impacts.

The Town's Findings with respect to "Fiscal Impacts" state "the Town is not in agreement with the analysis provided by BT Holdings, LLC and adopted by the lead agency as relates to the fiscal impacts of the Project." The Town's Findings are devoid of the calculations, methodologies utilized or other analyses it relied upon to reach that conclusion. Mere disagreement is not adequate. While it in the most conclusory of fashions attempts to demonstrate that the single family alternative would result in a net benefit because of declining school enrollments which it alleges is a "well known fact" (Need to deal with Town statement discrepancy) it provides and never has provided any calculations to support that conclusion. Without such methodological calculations and analyses there is no "fiscal impact analysis" In any event, even assuming that the conclusion is correct, it does not change the fact that the proposed actions result in a substantial net positive fiscal benefit and the Town has provided nothing to dispute that.

iv)  Recreational Facilities

The Town's Findings assert that the Lead Agency's Findings Statement failed to consider that many of the 1,036 residents as projects by BT Holdings LLC will utilize Town recreational facilities. The conclusion is inaccurate and contradicted by the record.

The record discloses that if and when developed the property will contain on-site recreational uses. Those uses will service the on site resident population. In addition, and as expressly acknowledged by the Town, the project will pay fees in lieu of parkland in the amount of $500 per unit directly to the Village. As set forth in the Affidavit of the Mayor, per long standing agreement with the Town, these recreation fees will be paid over to the Town. In addition, as evidenced in the fiscal analysis Village taxpayers pay taxes to the Town. Consequently, the matter of recreation impact was considered by the Village Board and addressed. The Town failed to raise recreation impacts as an issue

during the SERQA review. The Town's Findings fail to disclose in what specific manner the Villages Findings with respect to recreation do not adequately address impacts. The Town's own recreation statute is entirely discretionary with respect to the payment of parkland fees (cite statute). The Town has made no determination that the envisioned property development would pay Town recreation fees pursuant to its statute. Finally, as "a throw in," the Town criticizes the Village for failing to assess what maintenance costs the Town would incur for both Village and Town residents. This is yet another issue never raised by the Town during the environmental review. Nevertheless, the Village is providing revenue to the Town via tax dollars and recreation fees which the Town may use to off-set maintenance costs for "Town and Village Residents alike."

v) Visual Impacts:

The Town's Findings conclude that the proposed actions will not protect scenic views. The Town conducted no independent visual impact analysis to substantiate this conclusion. In contrast the Villages environmental review included renderings and simulations depicting the visual impacts of the envisioned development of the annexed property. As a result of these renderings and simulations the development vision was modified to reduce visual impacts. The Village Board reasonably determined that visual impacts are minimized or mitigated to the maximum extent practicable.

While a portion of the property to be annexed contains ridgeline, no part of the property itself falls within the Ridgeline Protection Overlay district of the Town and even if it did the regulations for the Ridgeline Protection overlay do not preclude development. (attach regs) Notwithstanding, the property was viewed as if it were regulated ridgeline and buildings were moved off the ridge. In addition, very substantial vegetative screening was identified as a mitigation measure to further reduce visual impact.

The vistas of concern articulated by the Town Route 17-M and Route 17 are developed and busy State Highways. Route 17 M in the immediate area is largely commercially developed with uses such as (cite to specific uses). Route 17 (i.e. Interstate 96) is a high speed highway. It takes seconds on that highway to pass-by the property. Consequently any visual impact is of very short duration. (Fill in with more detail) The Town also concludes that the envisioned development will be visible from several miles off. The statement is conclusory and has no support in record. (Fill in detail)

Finally, the Town concludes incorrectly that certain components of its Comprehensive Plan were ignored in the assessment of visual impacts. The entire comprehensive plan was considered. While the Town is able to point to statements in its comprehensive plan of protection of scenic vistas it is equally true that the plan designates this as one of ____properties in the entire Town for higher density development. (need specific comp plan quote if poss.) The record discloses that the Village considered both of these factors in its SEQRA review and balanced the goals in a manner that minimize visual impacts to the maximum extent practicable. The Town has not done that but rather cherry picked particular language from the plan to make its illicit point.

vi) Traffic Impacts:

While the Town rails against traffic impacts of the envisioned development, the five sentences devoted to it in the Town's Findings indicate nothing more than an unsubstantiated generalized concern on the part of the Town.

This is yet another area where the Town, if it disagreed, could have provided the Village with the basis of its disagreement during the SEQRA review process. It did not. Instead it has issued Findings that make the remarkable statement that if the property were to be developed in accordance with the Town's Comprehensive plan traffic impacts could be mitigated. The development envisioned for the property is precisely in accordance with its comprehensive plan and the record clearly discloses traffic impacts were analyzed and addressed.

A complete traffic impact study was prepared. The study was reviewed and vetted by the Village's own traffic consultant. The study demonstrates that the traffic from the envisioned development of the property can be adequately handled on the surrounding highways and at nearby intersections. The Town never submitted one iota of proof to contradict that conclusion. The Town simply assumes that a development of this size would automatically have adverse traffic impacts and that mitigation must be necessary. The assumption is directly contrary to the evidence in the record and is therefore an inappropriate basis for concluding adverse impact.

vii) Comprehensive Plan:

Yet again, the Town cherry picks two specific elements out of an entire zoning scheme comprising many elements and concludes that because the envisioned development does not meet those elements it is inconsistent with the Town's comprehensive plan. This is another example of how the Town selectively parses through its own comprehensive plan in an attempt to support its invalid arguments.

Initially, there are far more similarities to the current high density zoning for the property then dissimilarities. Indeed, these were specifically set forth in a Table to the Environmental Impact Statement which is attached hereto as Exhibit ___. As the Table indicates ... (recite the similarities)

The zoning dissimilarities focused on by the Town include cap of 20% on the number of 3 bedroom units permitted and the zoning's prohibition against multiple residential and town house uses being owned in a condominium form of ownership.

Restricting a residential unit's form of ownership has long been held illegal in New York. (cases) It therefore cannot be given any legitimate consideration. A percentage cap on the number of three bedroom units is not imposed under Village zoning and it would not apply to the envisioned development. However, the typical purpose of such a cap is to reduce the number of potential school age children and the impact on the school district. The Town claims that school district enrollments are declining so elimination of the cap

should not be a great concern. In any event, the maximum potential for three bedroom units under the envisioned development is...... This includes ____ 2 bedrooms units with a den designed to target the activity needs of empty nesters, active seniors and young professionals. (Nussbaum Affidavit). If these units are deducted the envisioned development will only has ____ 3 bedroom units or __% of the project. This singular difference is not significant enough to for the Town to reasonably conclude that the envisioned development of the property is inconsistent with the Town's comprehensive plan . (May need a little more help here.)

**From:**           Larry Wolinsky [lw@Jacobowitz.Com]
**Sent:**            Friday, June 08, 2012 8:23 AM
**To:**               Ian L. Schlanger; Frank Nussbaum; Alyse Terhune
**Subject:**       Today's Filing
**Attachments:**   1D54404-Verified Petition - SEQR.DOC

Folks-

Attached is a draft of todays filing
Please review and have any comments to me within the next two hours. Please note this is a perfunctory filing to preserve the statute of limitations. it will e amended so it does not have to be perfect!!!!!!!!!

Talk to you all later.

SUPREME COURT OF THE STATE OF NEW YORK
ORANGE COUNTY
---------------------------------------------------------

In the Matter of a Special Proceeding Pursuant to
CPLR Article 78,

VILLAGE OF CHESTER, VILLAGE BOARD of the
VILLAGE of CHESTER and BT HOLDINGS LLC

                                    Petitioners,

                 -against-

TOWN OF CHESTER and THE TOWN BOARD OF
THE TOWN OF CHESTER,

                                    Respondents.

---------------------------------------------------------

**VERIFIED PETITION**

Index No.: _____
Assigned Justice: _____

Petitioners, Village of Chester, Village Board of the Village of Chester, (the "Village") and BT Holdings LLC ("BT Holdings") respectfully show the Court:

## INTRODUCTION

1.     This proceeding, commenced pursuant to CPLR Article 78, seeks to annul and reverse the Town of Chester Town Board's (the "Town") May 9, 2012 decision denying BT Holdings' annexation petition on the ground that such denial was in violation of the requirements of the New York State Environmental Quality Review Act ("SEQRA") and was otherwise arbitrary and capricious and in violation of the law.

## PARTIES

2.     The Village is a municipal corporation organized and existing under the laws of the State of New York. Its principal place of business is located at Village Hall, 47 Main Street, Chester New York. The Village Board is comprised of four trustees and the Village Mayor.

1

3.      BT Holdings is a Delaware limited liability company with its principal place of business c/o Bernard Nussbaum, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York. BT Holdings is the owner of a 68.4 acre vacant land parcel located in both the Village of Chester and Town of Chester.

4.      The Town is a municipal corporation organized and existing under the laws of the State of New York. Its principal place of business is located at Town Hall, 1786 Kings Highway, Chester, New York. The Town Board is comprised of four councilpersons and the Supervisor.

## BACKGROUND

5.      On or about the 17th day of January, 2008, BT Holdings presented to the Town and to the Village, a petition for annexation of 60.4 acres of its 68.4 acre parcel to the Village pursuant to the provisions of GML Article 17. A copy of said petition is annexed hereto as Exhibit "A".

6.      A joint hearing was conducted by the Town and Village upon said petition pursuant to GML §705 on March 25, 2008. That hearing was adjourned and held open pending completion of the environmental review of the annexation petition under SEQRA.

7.      On April14, 2008 the Village became Lead Agency for purposes of SEQRA review. The Town consented to the Village being Lead Agency for SEQRA review.

8.      On April 14, 2008 the Village issued a determination of significance, also known as a "positive declaration" requiring a draft Environmental Impact Statement ("DEIS") be prepared in connection with the petition for annexation.

9.      On July 14, 2008 the Village issued a Scoping Document which delineated the matters to be addressed in the DEIS. The Scoping Document included items for review and analysis requested by the Town.

10.     The Scoping Document defined the actions for environmental review and consideration in the DEIS to be the requested annexation; the designation of a Village zoning classification and BT Holding's plan for development of the property.

10.     A draft DEIS was submitted for the Village to review in May, 2009. The draft DEIS was revised and resubmitted in October, 2009.

11.     On November 9, 2009 the DEIS was accepted as complete for purposes of commencing public review and comment.

12.     The DEIS was filed with all involved agencies including the Town.

13.     On January 7, 2010 the Village conducted a public hearing on the DEIS. The Town appeared at the public hearing by its Supervisor, Planning Board chairman and engineer. Comments offered by the Town were based on its review of an older draft DEIS rather than the DEIS that was accepted by the Village Board.

14.     The DEIS public comment period was closed on February 5, 2010.  The Town failed to submit any written comments to the accepted DEIS.

15.     Between February, 2010 and January, 2011 the Village and BT Holdings met in a number of technical review meetings to address comments and concerns raised at the DEIS public hearing and during the DEIS public comment period.

16.     During this year long technical review process, BT Holdings reached out to the Town on multiple occasions to engage it in the SEQRA process and to seek to address an resolve any issues the Town might have. The Town declined to meet with BT Holdings.

17.     The result of these meetings were substantial modifications to BT Holdings envisioned development of the property including: development of a Public Road Alternative to enhance community connectivity; removal of buildings in the scenic area along the ridge line above the

Talmadge farm; a 6% reduction in size of the townhouse community, now proposed as 336 townhouse units; more than a 25% reduction in the number of 3BR townhomes, now representing less than 50% of the total project; incorporation of a direct pedestrian access to the Chester Mall; expanded road widths to a minimum of 26' to facilitate emergency access; use of earth tone and non-reflective exterior building materials to further reduce visual impacts; inclusion of sustainable 'green building' techniques; preparation of a Vacant Parcel Water Utilization Analysis for the Village of Chester; $250K contribution to the Village of Chester for water infrastructure improvements as needed and further refinement of sewer accessibility options.

17.     A draft final EIS ("FEIS") was submitted to the Village on January 20, 2011.

18.     On April 22, 2011 a further revised draft FEIS was submitted to the Village.

19.     The FEIS was then accepted as complete by the Village on August 18, 2011.

20.     The FEIS was subsequently filed with all involved agencies, including the Town and was made available for public consideration and comment through September 21, 2011. The Town did not comment on the accepted FEIS.

21.     On December 12, 2011 the Village Board unanimously adopted a Lead Agency SEQR written Findings Statement (the "Village Findings Statement") determining that the proposed action is one that will, consistent with social, economic and other considerations to the maximum extent practicable, avoid or minimize environmental impacts revealed during the SEQRA process by incorporating as conditions to the decision those mitigative measures that were identified therein. A copy of the Village Findings Statement is annexed hereto as Exhibit "B."

22.     The Village Findings Statement was filed with all involved agencies including the Town.

4

23.     No further action was taken by the Town until February 22, 2012 at which time the Town and Village continued and then closed the joint annexation hearing.

24.     Thereafter, BT Holdings continued to reach out to the Town in an attempt to address and resolve any outstanding concerns the Town might have regarding the annexation action.

25.     On March 18, 2012, the Town Supervisor advised BT Holdings that if there were any outstanding issues by any individual Town Board member that BT Holdings would be contacted by that Board member. BT Holdings received no such contact.

26.     On March 27, 2012 the Town Supervisor sent BT Holdings an e-mail advising it the Town Board was anxious to make a decision on the annexation and the matter was being placed on the Town Board March 28, 2012 agenda "for discussion."

27.     On March 28, 2012 the Town Board, without justification or legitimate rationale, summarily voted to deny the annexation. BT Holdings counsel protested and advised the Town Board that it could not act without first issuing its own SEQRA Findings Statement based on the environmental record that was reflected in the FEIS. BT Holding's counsel requested that the annexation decision be rescinded pending the issuance of such SEQRA Findings. The Town Board voted not to rescind.

28.     On April 2, 2012 the Village Board voted to approve annexation. A copy of the Village Board's Determination and Order are attached hereto as Exhibit "D".

29.     On April 25, 2012 the Town voted to rescind it prior vote to deny annexation.

30.     On May 9, 2012, the Town issued its SEQRA Findings Statement (the "Town Findings Statement") and also voted again to deny the annexation request. A copy of the Town Findings Statement is attached hereto as Exhibit "E". A copy of the Town's Resolution and Order denying annexation is attached hereto as Exhibit "F".

31.    The Town SEQRA Findings adopted all of the Village SEQRA findings but for the following seven discreet matters: waste water, water, fiscal impacts, recreational facilities, visual impacts, traffic impacts and comprehensive plan. With respect to these discreet matters the Town determined that the proposed action is one that does not avoid or minimize environmental impacts to the maximum extent practicable and that identified adverse impacts cannot be mitigated.

32.    As set forth below, the Town violated SEQRA in multiple respects and, its findings with respect to the seven discreet matters it addresses are contrary to the substantial evidence in the record, arbitrary and capricious and otherwise unlawful.

## AS AND FOR A FIRST CLAIM FOR RELIEF

33.    Petitioners repeat each and every allegation contained in paragraphs 1 through 32 of this Verified Petition as if fully set forth at this point.

34.    The Town is an "involved agency" for purposes of SEQRA compliance.

35.    In its capacity as an involved agency the Town has the responsibility to assist the lead agency including providing it with information necessary for the lead agency to perform its SEQRA review and to otherwise participate as may be needed. 6 NYCRR 617.3 (e).

36.    The Town's importance as an involved agency and its concomitant responsibility to participate is heightened because it is on equal footing with the Village as to the proposed annexation -. Both the Town and the Village are required to consider the overall public interest and act. General Municipal Law § __

37.    The Town has failed to meet its responsibility as a SEQRA involved agency.

38.    The Town has failed to participate adequately in the SEQRA process and has done nothing other than express conclusory and generalized concerns.

6

39.     The little participation the Town did undertake occurred primarily in the early stages of the SEQRA process. At the time of the DEIS hearing the Town commented on the wrong version of the document.

40.     Post DEIS, the Town failed to participate altogether including its failure to issue any comment of the accepted FEIS prior to the Village issuing the Village Findings Statement.

41.     Further the Town ignored overt attempts to engage it more fully in the SEQRA process.

42.     The Town's wanton disregard of its responsibility as an involved agency violated SEQRA and consequently the Town SEQRA Findings must be voided and its annexation denial annulled.

## AS AND FOR A SECOND CLAIM FOR RELIEF.

43.     Petitioners repeat each and every allegation contained in paragraphs 1 through 42 of this Verified Petition as if fully set forth at this point.

44.     "No involved agency may make a final decision to… disapprove an action until …the agency has made a written Findings Statement." "Findings must (1) *consider the relevant environmental impacts, facts and conclusions disclosed in the final EIS*." 6 NYCRR 617.11 (c)." – Emphasis added

45.     The Town SEQRA Findings ignore the relevant environmental impacts, facts and conclusions disclosed in the final EIS.

46.     The Town SEQRA Findings contain multiple instances of facts that are not only absent from the final EIS but are absent from the SEQRA record altogether.

47.     In connection with wastewater, the Town asserts capacity numbers not based on any information contained in the final EIS or elsewhere.

48.     In connection with water, the Town asserts that it can be obtained via an outside user agreement with the Village. Again, a fact clearly not disclosed in the final EIS or elsewhere.

49.     In connection with fiscal impacts, the Town asserts that there is a significant reduction in student enrollment in the Chester School District -- yet another fact not disclosed in the final EIS or elsewhere.

50.     In connection with visual impacts the Town asserts the development is clearly visible for several miles from the project site -- another fact not disclosed in the final EIS or anywhere else.

51.     In reaching its conclusion of adverse impact, the Town has improperly relied on these and other fact assertions outside the environmental record.

52.     The Town's reliance on facts outside the final EIS is improper and unlawful because the Town is bound by the environmental record created by the lead agency during the SEQRA process. If the Town believed these assertions of fact to be valid and important it could have and should have disclosed them and the evidentiary support for them to the lead agency during the SEQRA process. It failed to do that.

53.     Because the Town relied on information not disclosed in the final EIS in reaching conclusions of adverse environmental impact, it violated SEQRA thereby requiring its SEQRA Findings and the underlying annexation denial to be annulled.

### AS AND FOR A THIRD CLAIM FOR RELIEF

54.     Petitioners repeat each and every allegation contained in paragraphs 1 through 42 of this Verified Petition as if fully set forth at this point.

55.     The Town SEQRA Findings must be annulled because they are contrary to the substantial evidence in the environmental record and are otherwise arbitrary and capricious and unlawful.

8

56.     With respect to wastewater the Town SEQRA Findings assert in the most conclusory and unsubstantiated fashion: a lack of wastewater capacity to serve the envisioned development of the BT Holdings property; a lack of viable options if future wastewater capacity becomes needed; the purported inability of the Village to serve the property with wastewater;  a sewer tax assessment of the property equating it to only 60 single family residential units and an allegation that the Village failed to consider build out of other vacant parcels in the sewer district.

57.     In contrast, the substantial evidence in the SEQRA record developed before the Village shows: preparation and completion of a complete wastewater study which was reviewed and vetted by the Village engineer and planning consultant; existence of adequate sewer capacity to service the envisioned development of BT Holdings property even after consideration of other developments pending and approved by the Town; viable options to create capacity should capacity not be available; that  no adverse impact to the Town or Village can occur in any event because the Village SEQRA Findings imposes a condition on the property that the property cannot be developed beyond the existence of available wastewater treatment capacity, a fact ignored and not disclosed in the Town SEQRA Findings.

58.     Further, the legal obligation to provide BT Holdings property with wastewater treatment remains with the Town sewer district and not the Village notwithstanding annexation Consequently, the Villages' current sewer availability is irrelevant.. (Cite GML and comptroller)

59.     Also irrelevant is the property's current Town sewer assessment since the property is assessed in its vacant land state and existing Town zoning permits the property to be developed to a much greater extent than 60 single family residences. There is no legal authority that limits sewer service to a current Town sewer tax assessment.

9

60.     With respect to water service the Town SEQRA Findings assert in the most conclusory and unsubstantiated fashion that water from the Village could have been obtained by "outside user agreement" and that on-site water resources were inadequately tested.

61.     In contrast, the substantial evidence in the SEQRA record developed before the Village shows: that the Village has more than adequate municipal water capacity to serve the property; that the Town has never indicated any intent or ability to serve the property with municipal water; that studies undertaken for the development of on-site water resources were adequate and demonstrate an insufficient supply to service BT Holdings envisioned development of the property or similar development of the property that is otherwise authorized under existing Town zoning and the Town's Comprehensive Plan and, that the Village has long been unwilling (for very good reasons) to serve the property by outside user agreement.

62.     With respect to fiscal impacts, the Town SEQRA Findings assert in the most conclusory and unsubstantiated fashion that Chester School District enrollments are declining and therefore a single family residence alternative, which would presumably generate more school children, would be fiscally beneficial for the Town.

63.     In contrast, the substantial evidence in the SEQRA record developed before the Village shows: that a full fiscal impact study was prepared as part of the SEQRA review; that such study was reviewed and vetted by the Village's planning consultant; that the study demonstrates that under the envisioned development of the property by BT Holdings, there will be a net fiscal benefit to all taxing jurisdictions including the Town and Chester School District; and that the Town does not dispute or otherwise contest this conclusion.

64.    With respect to recreational facilities, the Town SEQRA Findings assert in the most conclusory and unsubstantiated fashion that the Town will be deprived of recreation fees to offset the impacts of residents of the BT Holdings property use of Town parks.

65.    In contrast, the substantial evidence in the SEQRA record developed before the Village shows: that  Town local law only requires recreation fees on a case by case basis at the discretion of the Planning board and no determination has been made that the envisioned development of the BT Holdings property would be required to pay such fees; that as a condition of development approval BT Holdings will be required to provide on-site recreational facilities which will off set demand for the use of Town recreation facilities; that the Village will collect recreation fees from BT Holdings and, pursuant to agreement with the Town, will pay those fees over to the Town and that the BT Holdings development will generate surplus tax revenue for the Town which the Town may use toward development and maintenance of Town parks.

66.    With respect to visual impacts, the Town SEQRA Findings assert in the most conclusory and unsubstantiated fashion that the envisioned development of the BT Holdings property will result in adverse visual impacts.

67.    In contrast, the substantial evidence in the SEQRA record developed before the Village shows: that a visual impact analysis of the envisioned property development was prepared and consisted of renderings and visual simulations; that as a result of the visual impact analysis modifications were required for the envisioned development including moving buildings off the property ridgeline and requiring substantial vegetative buffer and fencing; that with the proposed modifications and mitigation visual impacts have been reduced to the maximum extent practicable; and that the objectives in the Town Comprehensive Plan to protect scenic vistas and the permit development of higher density housing on this property have been appropriately balanced.

68.     With respect to traffic impacts, the Town SEQRA Findings assert in the most conclusory and unsubstantiated fashions that impacts form the envisioned development of the property are substantial and adverse.

69.     In contrast, the substantial evidence in the SEQRA record developed before the Village shows: that a traffic impact study was prepared to assess the traffic impacts of the envisioned development ; that the study was reviewed and vetted by the Village's planning consultant and an independent traffic consultant retained by the Village; that the study demonstrates that, to the extent there will be decreases in levels of service at nearby intersection, such decreases are not significant and all intersections will continue to operate at acceptable levels of service and that no traffic impact mitigation is required.

70.  .   With respect to the Town Comprehensive Plan the Town asserts in the most conclusory and unsubstantiated fashion that the envisioned development of the property is contrary to such plan because it disregards the Town SR-6 zoning requirement of a 20% cap on three bedroom units and includes units owned in the condominium form of ownership which is prohibited by the Town's zoning.

71.     In contrast, the substantial evidence in the SEQRA record developed before the Village shows: that the envisioned BT Holdings property development permits the same residential uses at similar or lower densities as the Town's SR-6 zoning; that the number of three bedroom units that would be constructed on the BT Holdings property has not been determined and could range from zero to 208 units  (i.e.under 50 percent of the projects total units); that the restriction on three bedroom units is to prevent generation of school children; that the Town maintains elsewhere that additional school children need to be generated in order to combat alleged declining school

enrolments; and that the Town is not permitted by law to regulate form of ownership and cannot therefore prohibit condominium by zoning regulation.

72.    By virtue of all the foregoing its is abundantly clear that each and every one of the Town's seven grounds for finding adverse environmental impacts are contrary to the substantial evidence in the record, are arbitrary and capricious and otherwise violate the law. Consequently, the Town SEQRA Findings Statement and its underlying action denying annexation must be annulled.

**WHEREFORE,**  the Village and BT Holdings respectfully pray for an Order and Judgment, pursuant to CPLR Article 78, adjudicating and determining that the Town's SEQRA Findings and its underlying action denying annexation be reversed and annulled, and for such other  relief as the Court deems just and proper.

Dated: Walden, New York
      June 8, 2012

                                           JACOBOWITZ & GUBITS, LLP


                               BY:   _____
                                     Larry Wolinsky, Esq.
                                     Attorneys for Petitioner BT Holdings, LLC
                                     158 Orange Avenue
                                     Walden, New York  12586
                                     Telephone:  845-778-2121
                                     Facsimile:   845-778-5173

TO:    Town of Chester
       Town of Chester Town Board
       Town Hall
       1786 Kings Highway
       Chester, New York  10918-3013

13

| | |
|---|---|
| **From:** | Larry Wolinsky [lw@Jacobowitz.Com] |
| **Sent:** | Friday, June 08, 2012 9:11 AM |
| **To:** | ilsnc@frontiernet.net |
| **Subject:** | Re: Today's Filing |

Yes.

---

**From:** Ian L. Schlanger
**To:** Larry Wolinsky
**Sent:** Fri Jun 08 09:09:18 2012
**Subject:** RE: Today's Filing
Ha.  Yes, I think it outlines the Town's various transgressions.  Obviously, we will need to bolster this later on with an amended pleading, complete with affs as we discussed.  After you file, we should probably reach out to the town and let them know that an amended pleading will be filed (as a courtesy).  This way they can respond to the "real" pleading, and not the "holy shit lets get something in the door before the statute of limitations runs on us" pleading.  What do you think?  I have a call out to the Mayor to explain to him what is going on (so he's not shocked by the process).

---

**From:** Larry Wolinsky [mailto:lw@Jacobowitz.Com]
**Sent:** Friday, June 08, 2012 8:57 AM
**To:** ilsnc@frontiernet.net
**Subject:** Re: Today's Filing


Does it past the laugh test?

---

**From:** Ian L. Schlanger
**To:** Larry Wolinsky; 'Frank Nussbaum' ; Alyse Terhune
**Sent:** Fri Jun 08 08:54:22 2012
**Subject:** RE: Today's Filing
Larry:

Attached are my edits; such as they are before I've had my coffee.

---

**From:** Larry Wolinsky [mailto:lw@Jacobowitz.Com]
**Sent:** Friday, June 08, 2012 8:23 AM
**To:** Ian L. Schlanger; Frank Nussbaum; Alyse Terhune
**Subject:** Today's Filing

Folks-

Attached is a draft of todays filing
Please review and have any comments to me within the next two hours. Please note this is a perfunctory filing to preserve the statute of limitations. it will e amended so it does not have to be perfect!!!!!!!!!


Talk to you all later.

1

| | |
|---|---|
| From: | Larry Wolinsky [lw@Jacobowitz.Com] |
| Sent: | Friday, June 08, 2012 1:15 PM |
| To: | ilsnc@frontiernet.net |
| Subject: | Re: |

Yes. Its finalized per all comments and will be filed in the next hour or so. Thanks for your help!!!!!

**From:** Ian L. Schlanger
**To:** Larry Wolinsky
**Sent:** Fri Jun 08 13:13:45 2012
**Subject:**
Larry:

Are you all set with the Art 78?  I have to take my wife to a doctor's appointment and do not want to leave you hanging.
I will have e-mail capability of course.

Ian L. Schlanger
Norton & Christensen
60 Erie Street
Post Office Box 308
Goshen, New York 10924
845-294-7949
845-294-7791 (Fax)
ilsnc@frontiernet.net

| | |
|---|---|
| **From:** | Scott Bonacic [SBonacic@hvlaw.net] |
| **Sent:** | Monday, June 11, 2012 11:35 AM |
| **To:** | Larry Wolinsky |
| **Cc:** | Ian L. Schlanger; Alyse Terhune |
| **Subject:** | Re: A Heads Up |

Thanks for the heads-up Larry.

Sent from my handheld device.

On Jun 11, 2012, at 11:31 AM, "Larry Wolinsky" <lw@Jacobowitz.Com> wrote:

> Scott-
>
> Just to give you a heads up, an Article 78 against the Town was filed on Friday challenging the Town's annexation decision on SEQRA grounds. The Petitioners are both the Village and BT Holdings.  The Petition is somewhat perfunctory as this was done quickly in order to take the most conservative position on the statute of limitations. We will exercise our right to amend it within the next 20 days. So, after it gets served please review it with the understanding that there will be an amended pleading. Obviously, I didnt want you to start responding without knowing that.
>
> I believe the Village will move forward to file the Apprellate Division proceeding on the annexation itself on or before Friday the 15th.
>
> Best regards,
>
> Larry